398 So.2d 686 (1981)
Ex parte Christopher P. DEVINE.
(Re: Christopher P. DEVINE v. Alice Beth Clark DEVINE).
79-546.
Supreme Court of Alabama.
March 27, 1981.
William Henry Agee of Agee & Ghee, Anniston, for petitioner.
J. Todd Caldwell, Anniston, for respondent.
MADDOX, Justice.
We granted certiorari to review the question of whether the "tender years presumption," as applied in child custody proceedings, violates the Fourteenth Amendment to the United States Constitution. In the present case, the Court of Civil Appeals affirmed the trial court's usage of that presumption in awarding custody of the parties' two minor children to the respondent, Alice Beth Clark Devine. For the reasons hereinafter set forth, we reverse and remand.

I
Pursuant to Rule 10(e) of the Alabama Rules of Appellate Procedure, the petitioner/father (appellant below) and respondent/mother (appellee below) filed the following stipulations of fact to serve in lieu of the record on appeal:
and the Appellee, Alice Beth Clark Devine, (being the only parties in this cause) were legally and lawfully married on December 17, 1966, in Jefferson County, Georgia, and separated in Calhoun County, Alabama, on March 29, 1979.
(2) The two children born of the parties during their marriage, viz: Matthew Patrick Devine, a son, born June 29, 1972, and Timothy Clark Devine, a son, born June 25, 1975, (the custody as to both of whom the Court has awarded to Alice Beth Clark Devine) are children of "tender years" as contemplated by the "tender years" doctrine or presumption.

*687 (3) The Appellee/natural mother Alice Beth Clark Devine (hereinafter sometimes referred to as "Mrs. Devine") graduated from the Woman's College of Georgia in Milledgeville, Georgia, in 1962, receiving a B. S. degree with a major in Business Administration and a minor in Business Education. Since her graduation in 1962, Mrs. Devine has taught high school for 2 years at Margaret McAvoy High in Macon, Georgia; worked at the Georgia Rehabilitation Center for at least 2 years; was an instructor at the Augusta Area Technical School in Georgia for 2 years; was an instructortrainer with the Army at Fort Gordon, Georgia for approximately 2 years; taught in high school at Notasulga, Alabama for one year; directed a media library and taught classes for the Department of Rehabilitation at Auburn University for approximately 2 years; in 1975 commenced employment with the U. S. Army at Fort McClellan, Alabama, where she was employed continuously through the time of the trial of this cause as an Educational Specialist with a GS-11 rating earning in excess of $20,000 annually as salary (plus additional fringe benefits), and at the time of the trial Mrs. Devine indicated that she intended to remain employed at Fort McClellan or at some similar employment after the trial.
(4) Mrs. Devine was born July 20, 1940 and was 38 years of age at the time of the trial of this cause. The Appellant/natural father, Christopher P. Devine was born on January 15, 1937, and at the time of the trial of this cause he was a member of the faculty and head of the Guidance and Counseling Department at Jacksonville State University, Jacksonville, Alabama. At the time of the trial, the older son had just completed the first grade at the said University's Elementary Laboratory School and the younger son was enrolled in the said University's Nursery Laboratory School.
(5) The parties further adopt all findings of facts as set forth by the trial court in its judgment of divorce dated July 6, 1979, in its order dated September 6, 1979, and in its order dated October 17, 1979, and incorporate same herein by reference.
The September 6th order referred to in stipulation number 5 was rendered by the trial court in response to the father's initial post trial motion requesting the trial court to modify its custody award. In that order the trial court offered the following justification for its decision:
The facts of this case clearly show that either plaintiff or defendant would be a fit and proper person to be vested with the care, custody and control of the parties' minor children. While there was evidence presented at trial which raised questions in the mind of the court as to each parent's suitability, none presented was of such magnitude that it showed either to be unfit. Likewise, evidence was presented to the court showing that each parent possessed certain positive qualities that should be considered in determining which of them would be the proper one to be awarded custody.
At the conclusion of the case, there did not exist a clear preponderance of the evidence for either party regarding child custody. However, there exists in Alabama law a presumption that when dealing with children of tender years, the natural mother is presumed, in absence of evidence to the contrary, to be the proper person to be vested with custody of such children. This presumption, while perhaps weaker now than in the past, remains quite viable today. See e. g. Thompson v. Thompson, 57 Ala.App. 57, 326 So.2d 124 (1975), cert. den. 295 Ala. 425, 326 So.2d 129 (1976); Taylor v. Taylor, 372 So.2d 337 (Ala.Civ.App.1979), cert. den. 372 So.2d 341 (Ala.1979).
Based upon the evidence presented at trial, the presumption of fitness discussed above and the court's opinion that it was in the children's best interest that they be in the custody of their mother, custody was placed subject to plaintiff's liberal visitation rights.
On October 17, 1979, in response to the father's second post trial motion, the trial *688 court reaffirmed its position concerning the relative parental suitability of the parties:
The facts of this case make it obvious that either of the parties would be fit and proper to be awarded the general care, custody, and control of the minor children born of their marriage. They both have individual shortcomings; however, neither possesses adverse qualities of a nature or character sufficient to make either an unfit parent.
The sole issue presented for review is whether the trial court's reliance on the tender years presumption deprived the father of his constitutional entitlement to the equal protection of the law. In resolving this issue, we feel it is necessary to consider the historical development of the tender years presumption and re-examine its modern efficacy in light of recent pronouncements by the United States Supreme Court.

II
At common law, it was the father rather than the mother who held a virtual absolute right to the custody of their minor children.[1] This rule of law was fostered, in part, by feudalistic notions concerning the "natural" responsibilities of the husband at common law. The husband was considered the head or master of his family, and, as such, responsible for the care, maintenance, education and religious training of his children. By virtue of these responsibilities, the husband was given a corresponding entitlement to the benefits of his children, i. e., their services and association. It is interesting to note that in many instances these rights and privileges were considered dependent upon the recognized laws of nature and in accordance with the presumption that the father could best provide for the necessities of his children:
Undoubtedly, the father has primarily, by law as by nature, the right to the custody of his children. This right is not given him solely for his own gratification, but because nature and the law ratifying nature assume that the author of their being feels for them a tenderness which will secure their happiness more certainly than any other tie on earth. Because he is the father, the presumption naturally and legally is that he will love them most, and care for them most wisely. And, as a consequence of this, it is presumed to be for the real interest of the child that it should be in the custody of its father, as against collateral relatives, and he, therefore, who seeks to withhold the custody against the natural and legal presumption, has the burden of showing clearly that the father is an unsuitable person to have the custody of his child.
Hibbette v. Baines, 78 Miss. 695, 29 So. 80 (1900). As Chief Justice Sharkey more eloquently stated in his dissenting opinion in Foster v. Alston, 7 Miss. (6 How.) 406, 463 (1842):
We are informed by the first elementary books we read, that the authority of the father is superior to that of the mother. It is the doctrine of all civilized nations. It is according to the revealed law and the law of nature, and it prevails even with the wandering savage, who has received none of the lights of civilization.
By contrast, the wife was without any rights to the care and custody of her minor children. By marriage, husband and wife became one person with the legal identity of the woman being totally merged with that of her husband. As a result, her rights were often subordinated to those of her husband and she was laden with numerous marital disabilities. As far as any custodial rights were concerned, Blackstone stated *689 the law to be that the mother was "entitled to no power [over her children], but only to reverence and respect." 1 W. Blackstone, Commentaries on the Law of England 453 (Tucker ed. 1803).
By the middle of the 19th century, the courts of England began to question and qualify the paternal preference rule. This was due, in part, to the "hardships, not to say cruelty, inflicted upon unoffending mothers by a state of law which took little account of their claims or feelings." W. Forsyth, A Treatise on the Law Relating to the Custody of Infants in Cases of Difference Between Parents or Guardians 66 (1850). Courts reacted by taking a more moderate stance concerning child custody, a stance which conditioned a father's absolute custodial rights upon his fitness as a parent. Ultimately, by a series of statutes culminating with Justice Talfourd's Act, 2 and 3 Vict. c. 54 (1839), Parliament affirmatively extended the rights of mothers, especially as concerned the custody of young children. Justice Talfourd's Act expressly provided that the chancery courts, in cases of divorce and separation, could award the custody of minor children to the mother if the children were less than seven years old. This statute marks the origin of the tender years presumption in England.
In the United States the origin of the tender years presumption is attributed to the 1830 Maryland decision of Helms v. Franciscus, 2 Bland Ch. (Md.) 544 (1830). In Helms, the court, while recognizing the general rights of the father, stated that it would violate the laws of nature to "snatch" an infant from the care of its mother:
The father is the rightful and legal guardian of all his infant children; and in general, no court can take from him the custody and control of them, thrown upon him by the law, not for his gratification, but on account of his duties, and place them against his will in the hands even of his wife.... Yet even a court of common law will not go so far as to hold nature in contempt, and snatch helpless, puling infancy from the bosom of an affectionate mother, and place it in the coarse hands of the father. The mother is the softest and safest nurse of infancy, and with her it will be left in opposition to this general right of the father.
Thus began a "process of evolution, perhaps reflecting a change in social attitudes, [whereby] the mother came to be the preferred custodian of young children and daughters...." Foster, Life with Father: 1978, 11 Fam.L.Q. 327 (1978).
In Alabama, the first noticeable discussion of the tender years presumption appears in the case of Cornelius v. Cornelius, 31 Ala. 479 (1858). In that case, the court awarded custody of a young male child to the mother because the father was found to be guilty of certain "fixed intemperate habits"; however, the court qualified its decision by stating that the father could later recover the custody of his child by presenting credible evidence that he had reformed. The court at 31 Ala. 482 reasoned as follows:
There would be much difficulty in laying down an absolute rule, fixing a period when the custody of a male child should be taken from the mother and given to the father. If all parents were alike suitable, possibly we might do so. As we before remarked, a father or mother who is every way qualified for the trust at one time, may be wholly unfit at another. Where there is no unfitness in the mother, evidently the child should remain with her, until he has reached an age when he can dispense with those tender offices which only a mother can bestow. At what particular age that period will arrive, we will not undertake at this time to determine. On the other hand, if one parent be a suitable custodian of the child, and the other not, and this suitableness of the one and unfitness of the other continue, the child should be put under the care of the one who is suitable, and no change should be afterwards made. [Emphasis supplied.]
While recognizing a need for young children to remain in the custody of their mother, the court was not prepared to totally *690 deny the father's "natural rights." The court was apparently as concerned, if not more concerned, with the unfitness of the father as with the tender age of the child.
The attitude expressed in Cornelius was not readily accepted. Alabama courts continued to award custody to the father, even in cases involving very young children. In Bryan v. Bryan, 34 Ala. 516 (1859), for example, the court awarded the custody of a two-year-old boy and a four-year-old girl to the father; however, in doing so, the court admitted its reluctance to take young children from their mother. At 34 Ala. 521-522 the court stated:
[W]e would have been extremely reluctant at the commencement of this suit to have withheld our sanction to the protection of the mother in the custody of the children, because at that time one of them was an infant of ten months at the breast, and the other a girl only three years of age. But now the period of lactation with the younger child has passed, and two years have been added to the ages of the children; and it is not now impossible for the father to discharge the duties of nurture and care, in which he will be aided by his mother. Taking into consideration the fact that the defendant is not shown to be of such character, or to have such habits as would necessarily contaminate the children, or render them unsafe in his custody, and the strong favor with which the law regards the father's prior right to the custody of his children, and the unauthorized state of separation from her husband in which the petitioner has placed herself, and her want of any peculiar fitness for the custody and care of the children, and also that the children have passed the age when the mother's care, though valuable and desirable, is indispensable, we deem it our duty to withhold any active interference in behalf of the wife's exclusive custody and control of the children.
In Bryan, the age of the children was clearly a significant factor in the court's decision, although the court did mention the mother's "want of any peculiar fitness for the custody and care of the children."
The next major event which promoted the establishment of the tender years presumption in Alabama occurred when the legislature passed an act which affected custodial rights of parents. In both Cornelius and Bryan the court had acted pursuant to a statute which authorized the chancery courts, in cases of divorce, to award the custody of minor children to either the father or the mother. Code of 1852, § 1977. Although the statute then in force appeared to place the mother and father on equal footing, the courts generally respected the common law rule concerning the father's priority rights. On April 23, 1873, the Alabama Legislature passed an act to further define the custodial rights of fathers. 1872-73 Ala.Acts, Act No. 79. That act provided:
That from and after the passage of this act, any father legally married to the mother of his child or children, shall be entitled to the custody of such child or children, in case such father is abandoned by the mother of such child or children, as soon as such child or children shall have attained the age of seven years; Provided, Such father is a suitable person to have the charge of such child or children. This statute shall be liberally construed.
Admittedly, the statute applied to a very narrow category of cases, viz., those cases in which a wife had voluntarily abandoned her husband. Nevertheless, the new act established a rule that, even in those fact situations clearly justifying an award of custody to the father, the father would not be entitled to the custody of his minor children until they were seven years old. In construing this language in Thomas v. Thomas, 212 Ala. 85, 101 So. 738 (1924), this Court stated:
This provision is a recognition of the fact that during the very tender years of the child the husband has not an unqualified right to its custody, even when the wife is at fault in the separation. Mothering of a young child is one of its rights. None but the real mother can meet this high duty in full measure.
*691 As late as 1946, this Court continued to recognize the paternal preference rule. Brown v. Jenks, 247 Ala. 596, 25 So.2d 439 (1946); however, by that time the rule was no longer a formidable factor in resolving child custody disputes. The influence of the paternal preference rule had been gradually replaced by a growing adherence to the tender years presumption.
At the present time, the tender years presumption is recognized in Alabama as a rebuttable factual presumption based upon the inherent suitability of the mother to care for and nurture young children. All things being equal, the mother is presumed to be best fitted to guide and care for children of tender years.[2]Statham v. Statham, 276 Ala. 675, 166 So.2d 403 (1964); Clift v. Clift, 346 So.2d 429 (Ala.Civ.App. 1977). To rebut this presumption the father must present clear and convincing evidence of the mother's positive unfitness. McGregor v. McGregor, 257 Ala. 232, 58 So.2d 457 (1952); Thompson v. Thompson, 57 Ala.App. 57, 326 So.2d 124 (1975). Thus, the tender years presumption affects the resolution of child custody disputes on both a substantive and procedural level. Substantively, it requires the court to award custody of young children to the mother when the parties, as in the present case, are equally fit parents. Procedurally, it imposes an evidentiary burden on the father to prove the positive unfitness of the mother.
In recent years, the tender years doctrine has been severely criticized by legal commentators as an outmoded means of resolving child custody disputes. Several state courts have chosen to abandon or abolish the doctrine, noting that the presumption "facilitates error in an arena in which there is little room for error." Bazemore v. Davis, 394 A.2d 1377 (D.C.1978); accord, Burks v. Burks, 564 P.2d 71 (Alaska 1977); In re Marriage of Bowen, 219 N.W.2d 683 (Iowa 1974); McAndrew v. McAndrew, 39 Md. App. 1, 382 A.2d 1081 (1978); Commonwealth ex rel. Spriggs v. Carson, 470 Pa. 290, 368 A.2d 635 (1977). Only one court has expressly declared the presumption unconstitutional. State ex rel. Watts v. Watts, 77 Misc.2d 178, 350 N.Y.S.2d 285 (1973). Nevertheless, some form of the presumption remains in effect in at least twenty-two states.[3] In twenty states the doctrine has been expressly abolished by statute or court decision,[4] and in four other states its existence is extremely questionable.[5] In four states the presumption remains in effect despite a state's equal rights amendment or statutory language to the contrary.[6] As far as Alabama is concerned, the trial court correctly noted that the presumption, "while perhaps weaker now than in the past, remains quite viable today."
It is safe to say that the courts of this state, like the courts of sister states, have come full circle in resolving the difficult questions surrounding child custody. At common law, courts spoke of the natural rights of the father. Now they speak of the instinctive role of the mother.
*692 The question we are confronted with is not dissimilar to the question confronting the English courts over 150 years ago: Is it proper to deny a parent the custody of his or her children on the basis of a presumption concerning the relative parental suitability of the parties? More specifically, can the tender years presumption withstand judicial scrutiny under the Fourteenth Amendment to the United States Constitution as construed in recent decisions by the Supreme Court of the United States?

III
The appellate courts of this state have held that the tender years presumption is "not a classification based upon gender, but merely a factual presumption based upon the historic role of the mother," Hammac v. Hammac, 246 Ala. 111, 19 So.2d 392 (1944). These statements indicate that the courts in the forties had not developed the sensitivity to gender-based classifications which the courts by the seventies had developed. In Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), the United States Supreme Court held that any statutory scheme which imposes obligations on husbands, but not on wives, establishes a classification based upon sex which is subject to scrutiny under the Fourteenth Amendment. The same must also be true for a legal presumption which imposes evidentiary burdens on fathers, but not on mothers. The fact that the presumption discriminates against men rather than women does not protect it from judicial scrutiny. Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).
Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), represents the first in a series of cases wherein the United States Supreme Court has considered the constitutionality of statutory classifications which discriminated between men and women on the basis of sex. In Reed the Court examined a mandatory provision of the Idaho probate code giving a preference to men over women when persons of equal entitlement applied for appointment as administrator of a decedent's estate. Under the facts of that case the law gave preference to the father, rather than the mother, for appointment as administrator of a child's estate. At the very outset of the opinion the Court expressed its concern over the fact that no attempt was made to determine the relative capabilities of the parties to perform the functions incident to the administration of an estate. 404 U.S. at 73, 92 S.Ct. at 252. The statute was intended to relieve the probate court of a difficult decision when two or more persons, equally entitled, sought letters of administration. The Court reasoned that:
To give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; and whatever may be said as to the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex.
404 U.S. at 76-77, 92 S.Ct. at 254.
Two years later in Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), the Court relied on Reed in striking down a federal statutory scheme which extended a "presumption of dependency" in case of spouses of male members of the uniformed services, but not to spouses of female members. This presumption permitted a male member to claim his wife as a "dependent" without regard to whether she was, in fact, dependent upon him for any part of her support. A female member, on the other hand, could not claim her husband as a "dependent" unless he was, in fact, dependent upon her for over one-half of his support. Thus, as a procedural matter, a female member was required to demonstrate her spouse's dependency, while no such burden was imposed upon male members. As in Reed, the Court questioned the underlying purpose of the statute and, in doing so, alluded to the lower court's speculative analysis:

*693 Although the legislative history of these statutes sheds virtually no light on the purposes underlying the differential treatment accorded male and female members, a majority of the three-judge District Court surmised that Congress might reasonably have concluded that, since the husband in our society is generally the "breadwinner" in the family and the wife typically the "dependent" partner"it would be more economical to require married female members claiming husbands to prove actual dependency than to extend the presumption of dependency to such members." [Frontiero v. Laird] 341 F.Supp. [201], at 207. Indeed, given the fact that approximately 99% of all members of the uniformed services are male, the District Court speculated that such differential treatment might conceivably lead to a "considerable saving of administrative expense and manpower."
Moreover, the government maintained that, as an empirical matter, wives in our society frequently are dependent upon their husbands while husbands rarely are dependent upon their wives. Thus, the government argued that Congress might reasonably have concluded that it would be both cheaper and easier to conclusively presume that wives of male members are financially dependent upon their husbands, while burdening female members with the task of establishing dependency in fact.
In considering these rational explanations of the statutory scheme, the Court cited Reed for the proposition that classifications based upon sex, like classifications based upon race, are inherently suspect and must therefore be subjected to close judicial scrutiny. 411 U.S. at 682, 93 S.Ct. at 1768. Additionally, the Court expanded the reasoning used in Reed by considering, in a general fashion, the constitutionality of statutes which distinguish between males and females on the basis of "old notions," notions based upon stereotyped distinctions between the sexes. At 411 U.S. at 686, 93 S.Ct. at 1770, the Court reasoned that:
[S]ince sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate "the basic concept of our system that legal burdens should bear some relationship to individual responsibility ...." Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175 [92 S.Ct. 1400, 1406, 31 L.Ed.2d 768] (1972). And what differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society. As a result, statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members.
In closing, the Court concluded that:
[O]ur prior decisions make clear that, although efficacious administration of governmental programs is not without some importance, "the Constitution recognizes higher values than speed and efficiency." Stanley v. Illinois, 405 U.S. 645, 656 [92 S.Ct. 1208, 1215, 31 L.Ed.2d 551] (1972). And when we enter the realm of "strict judicial scrutiny," there can be no doubt that "administrative convenience" is not a shibboleth, the mere recitation of which dictates constitutionality. See Shapiro v. Thompson, 394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 600] (1969); Carrington v. Rash, 380 U.S. 89 [85 S.Ct. 775, 13 L.Ed.2d 675] (1965). On the contrary, any statutory scheme which draws a sharp line between the sexes, solely, for the purpose of achieving administrative convenience, necessarily commands "dissimilar treatment for men and women who are ... similarly situated," and therefore involves the "very kind of arbitrary legislative choice forbidden by the [Constitution]...." Reed v. Reed, 404 U.S., at 77, 76 [92 S.Ct., at 254].
411 U.S. at 690, 93 S.Ct. at 1772.
In subsequent decisions relying on Reed and Frontiero, the court reaffirmed and *694 expanded its equal protection analysis. Orr v. Orr, supra; Craig v. Boren, supra; Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). In Craig, for example, the Court considered the constitutionality of certain Oklahoma statutes which prohibited the sale of "nonintoxicating" 3.2% beer to males under the age of twenty-one and females under the age of eighteen. The Court concluded that the gender-based differential violated the Fourteenth Amendment and reasoned as follows:

Reed v. Reed has ... provided the underpinning for decisions that have invalidated statutes employing gender as an inaccurate proxy for other, more germane bases of classification. Hence, "archaic and overbroad" generalizations, Schlesinger v. Ballard, supra [419 U.S. 498] at 508, [95 S.Ct. 572, 577], concerning the financial position of servicewomen, Frontiero v. Richardson, supra [411 U.S.], at 689 n.23 [93 S.Ct., at 1772 n.23], and working women, Weinberger v. Wiesenfeld, 420 U.S. 636, 643 [95 S.Ct. 1225, 1230, 43 L.Ed.2d 514] (1975), could not justify use of a gender line in determining eligibility for certain governmental entitlements. Similarly, increasingly outdated misconceptions concerning the role of females in the home rather than in the "marketplace and world of ideas" were rejected as loose-fitting characterizations incapable of supporting state statutory schemes that were premised upon their accuracy. Stanton v. Stanton, supra; Taylor v. Louisiana, 419 U.S. 522, 535 n.17 [95 S.Ct. 692, 700 n.17, 42 L.Ed.2d 690] (1975). In light of the weak congruence between gender and the characteristic or trait that gender purported to represent, it was necessary that the legislatures choose either to realign their substantive laws in a gender-neutral fashion or to adopt procedures for identifying those instances where the sex-centered generalization actually comported with fact. See e. g., Stanley v. Illinois, supra [405 U.S.], at 648 [92 S.Ct., at 1211], cf. Cleveland Board of Education v. LaFleur, 414 U.S. 632, 650 [94 S.Ct. 791, 801, 39 L.Ed.2d 52] (1974).
Likewise, in Orr the Court declared unconstitutional an Alabama statutory scheme imposing alimony obligations on husbands but not wives. In very terse language, the Court commented on statutes which reinforce the concept of the sexual stereotype:
Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the "proper place" of women and their need for special protection. Cf. United Jewish Organizations v. Carey, 430 U.S. 144, 173-174 [97 S.Ct. 996, 1013, 51 L.Ed.2d 229] (1977) (opinion concurring in part). Thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex.
440 U.S. at 283, 99 S.Ct. at 1113.
Reed, Frontiero and Orr are particularly significant cases insofar as they scrutinize gender-based classifications involving husbands and wives. In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Court considered a similar issue regarding gender-based distinctions involving fathers and mothers.[7] In Caban, the appellant, Abdiel Caban, challenged the constitutionality of § 111 of the New York Domestic Relations Law which permitted *695 an unwed mother, but not an unwed father, to block the adoption of their minor child simply by withholding consent. Caban lived with appellee, Maria Mohammed, for approximately five years, during which time Mohammed gave birth to two children. Caban was identified as the father on each child's birth certificate and, together with Mohammed, he contributed to the support of the children. Mohammed eventually took the two children and left Caban to take up residence with Kazin Mohammed whom she subsequently married. Even after the separation, Caban continued to visit and communicate with his children.
In a subsequent dispute over the custody of the children, a New York Family Court placed the children in the temporary custody of the Mohammeds and gave Caban and his new wife liberal visitation rights. Approximately one year later the Mohammeds filed a petition seeking to adopt the two children. The Cabans immediately cross-petitioned for adoption. Relying on § 111, the New York court granted the Mohammeds' petition, allowing the Cabans to present evidence only insofar as it reflected upon the Mohammeds' qualifications as prospective parents.
On appeal to the United States Supreme Court Caban asserted that the distinction drawn under New York law between the adoption rights of unwed fathers and unwed mothers violated the Equal Protection Clause of the Fourteenth Amendment. The Court agreed, rejecting the mother's argument that the distinction was justified by a fundamental difference between maternal and paternal relations. At 441 U.S. 389, 99 S.Ct. 1766 the Court reasoned as follows:
Contrary to appellees' argument and to the apparent presumption underlying § 111, maternal and paternal roles are not invariably different in importance. Even if unwed mothers as a class were closer than unwed fathers to their newborn infants, this generalization concerning parent-child relations would become less acceptable as a basis for legislative distinctions as the age of the child increased. The present case demonstrates that an unwed father may have a relationship with his children fully comparable to that of the mother.... There is no reason to believe that the Caban childrenaged 4 and 6 at the time of the adoption proceedingshad a relationship with their mother unrivaled by the affection and concern of their father. We reject, therefore, the claim that the broad, gender-based distinction of § 111 is required by any universal difference between maternal and paternal relations at every phase of a child's development.
In closing, the Court rephrased this reasoning:
The facts of this case illustrate the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children. Section 111 both excludes some loving fathers from full participation in the decision whether their children will be adopted and, at the same time, enables some alienated mothers arbitrarily to cut off the paternal rights of fathers. We conclude that this undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State's asserted interests.
441 U.S. at 394, 99 S.Ct. at 1769. Caban is closely analogous to the present controversy, and is authority for the judgment we render.

IV
Having reviewed the historical development of the presumption as well as its modern status, and having examined the presumption in view of the holdings in Reed, Frontiero, Orr and Caban, we conclude that the tender years presumption represents an unconstitutional gender-based classification which discriminates between fathers and mothers in child custody proceedings solely on the basis of sex. Like the statutory presumption in Reed, the tender years doctrine creates a presumption *696 of fitness and suitability of one parent without any consideration of the actual capabilities of the parties. The tender years presumption, like the statutory schemes in Frontiero and Orr, imposes legal burdens upon individuals according to the "immutable characteristic" of sex. By requiring fathers to carry the difficult burden of affirmatively proving the unfitness of the mother, the presumption may have the effect of depriving some loving fathers of the custody of their children, while enabling some alienated mothers to arbitrarily obtain temporary custody. Cf., Caban, supra, 441 U.S. at 394, 99 S.Ct. at 1769. Even so, a gender-based classification, although suspect, may be justified if it is substantially related to a significant state interest. See, Reed, Frontiero and Caban, supra.
Admittedly, the State has a significant interest in overseeing the care and custody of infants. In fulfilling this responsibility in child custody proceedings, the courts of this state, in custody determinations, have applied the "best interests of the child" rule.[8]Brill v. Johnson, 293 Ala. 435, 304 So.2d 595 (1974); Carter v. Harbin, 279 Ala. 237, 184 So.2d 145 (1966). We are convinced that the tender years presumption rejects the fundamental proposition asserted in Caban that "maternal and paternal roles are not invariably different in importance." Caban, supra at 441 U.S. 389, 99 S.Ct. 1766. Even if mothers as a class were closer than fathers to young children, this presumption concerning parent-child relations becomes less acceptable as a basis for judicial distinctions as the age of the child increases. Id. Courts have come to rely upon the presumption as a substitute for a searching factual analysis of the relative parental capabilities of the parties, and the psychological and physical necessities of the children. The presumption has thus become what one writer refers to as an "anodyne" for the difficult decisions confronting the court. Roth, The Tender Years Presumption in Child Custody Disputes, 15 J.Fam.L. 423, 438 (1976). However, as Justice White correctly observed in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), "[p]rocedure by presumption is always cheaper and easier than individualized determination." In view of the fact that the welfare of children and competing claims of parents are at stake, such a means of determination cannot be justified.
The trial court's custody decree conclusively shows that the tender years presumption was a significant factor underlying the court's decision. Confronted with two individuals who were equally fit (i. e., all things being equal), the trial court awarded custody to the mother.
Accordingly, the judgment of the Court of Civil Appeals affirming the lower court decree and affirming the constitutionality of the tender years presumption is hereby reversed. The cause is due to be remanded to the trial court with directions that the court consider the individual facts of the case. The sex and age of the children are indeed very important considerations; however, the court must go beyond these to consider the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each *697 parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report and recommendation of any expert witnesses or other independent investigator; available alternatives; and any other relevant matter the evidence may disclose. In re Marriage of Winter, 223 N.W.2d 165 (Iowa 1974); see also, Johnson v. Johnson, 564 P.2d 71 (Alaska 1977); In re Marriage of Bowen, 219 N.W.2d 683 (Iowa 1974); Christensen v. Christensen, 191 Neb. 355, 215 N.W.2d 111 (1974). Only in this way will the court truly consider the best interests of the Devine children.
REVERSED AND REMANDED WITH DIRECTIONS.
FAULKNER, JONES, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
TORBERT, C. J., dissents.
ALMON, J., not sitting.
TORBERT, Chief Justice (dissenting).
The majority of the Justices on this Court have voted to abolish the tender years doctrine for all purposes in this state. I believe that decision goes too far, and I would retain the doctrine as a factor to be considered in deciding to which parent custody should be awarded.
The well-being of the child is the paramount consideration in determining its custody. Strickland v. Strickland, 285 Ala. 693, 235 So.2d 833 (1970); Ayers v. Kelly, 284 Ala. 321, 224 So.2d 673 (1969); Curry v. Curry, 283 Ala. 272, 215 So.2d 715 (1968). The focus in a child custody hearing is on the child's welfare and best interest, not on the parents or their personal rights. Custody of one's child is not a prize to be fought for; rather it is a responsibility imposed by the court under appropriate conditions or restrictions the court sees fit to impose. Therefore, Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), and Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), as well as other cases cited by the majority, have no relevance in the field of child custody. Gender may be an inappropriate factor to consider in bestowing a benefit, but it should be a factor in determining which parent will have primary custody of a very small child.
We are not faced here with the type of problem dealt with in Orr, Frontiero, and Reed, i. e., a rule by which one gender was given absolute preference over the other. The tender years doctrine, as the majority correctly stated, has evolved over the years into a factor to be considered in child custody determinations, rather than a compelling presumption. See, Jenkins v. Jenkins, 376 So.2d 1099 (Ala.Civ.App.1979). I believe it is valid as such, and should be retained in its present form. I therefore respectfully dissent.
NOTES
[1] There are a number of excellent law review articles recounting the historical development of the tender years presumption. For purposes of this opinion, we have relied heavily on Foster, Life With Father: 1978, 11 Fam.L.Q. 321 (1978), reprinted in S. Katz & M. Inker, Fathers, Husbands & Lovers: Legal Rights & Responsibilities 139 (1979); Roth, The Tender Years Presumption in Child Custody Disputes, 15 J.Fam.L. 423 (1976); Podell, CustodyTo Which Parent? 56 Marq.L.Rev. 51 (1972); and Comment, Measuring the Child's Best InterestA Study of Incomplete Considerations, 44 Den.L.J. 132 (1967). See also, 69 Am.Jur.2d Parent and Child §§ 28-31 (1971).
[2] In Wells v. Wells, 117 S.W.2d 700 (Mo.App. 1938), the court briefly alluded to the fact that at common law, the paternal preference rule was based, in part, upon the assumption that "all things being equal" the father was presumed to be the best custodian. Thus, the paternal preference, like the tender years presumption, was intended to resolve difficult custody questions when divorcing parents were equally fit. The contrasting rules, therefore, share a common assumption, i. e., "all things being equal" one parent is presumed to be a better custodian; however, from this common assumption they "presume" different conclusions.
[3] Alabama, Arkansas, Florida, Idaho, Kentucky, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, Wisconsin and Wyoming. For an excellent listing of the status of the tender years presumption in the various states see Foster, Life with Father: 1978, 11 Fam.L.Q. 321 (1978) and Annot., 70 A.L.R.3d 262 (1976).
[4] Alaska, Arizona, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Illinois, Indiana, Iowa, Maine, Massachusetts, Michigan, Nebraska, New York, North Carolina, Ohio, Texas and Washington.
[5] Kansas, Oregon, Pennsylvania and Vermont.
[6] Louisiana, Maryland, Minnesota and Utah.
[7] We recognize that this Court has denied certiorari in several cases wherein the Court of Civil Appeals had examined the constitutionality of the tender years presumption. Taylor v. Taylor, 372 So.2d 337 (Ala.Civ.App.1979), cert. den. 372 So.2d 341 (Ala.1979); Thompson v. Thompson, 57 Ala.App. 57, 326 So.2d 124 (1974), cert. den. 295 Ala. 425, 326 So.2d 129 (1976). However, these decisions were rendered prior to Caban. We granted certiorari in the instant case to re-examine the constitutionality of the presumption in light of the Caban decision.
[8] Ironically, the first application of the best interests rule in an Alabama divorce proceeding was made in Cornelius v. Cornelius, supra, the first case discussing the tender years presumption. Prior to that time the rule had only been recognized in those cases wherein children were outside the custody of their father and he asserted his natural rights to their custody by way of habeas corpus. Ex parte Boaz, 31 Ala. 425 (1858); Neville v. Reed, 134 Ala. 317, 32 So. 659 (1901). Thus, from a common origin the tender years presumption and the best interests of the child rule have grown side by side. In virtually every case wherein this Court applied the tender years rule, it would also express its abiding concern for the best interests of the child. See, e. g., Hammac v. Hammac, supra; Goldman v. Hicks, 241 Ala. 80, 1 So.2d 18 (1941); Stoddard v. Bruner, 217 Ala. 207, 115 So. 252 (1928); Thomas v. Thomas, 212 Ala. 85, 101 So. 738 (1924). As far as the courts were concerned, the best interests of young children were always served by placing them in the custody of their mother.